**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **SANGRIA LEWIS,** | ) | |
| | ) | |
| *Plaintiff*, | ) | **Civil Action File No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **29TH STREET PROPERTY** | ) | |
| **MANAGEMENT LLC d/b/a HAVEN** | ) | |
| **RESIDENTIAL** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Sangria Lewis ("Plaintiff") files this Complaint against Defendant 29th Street Property Management LLC d/b/a Haven Residential ("Defendant"). Plaintiff respectfully shows this Court as follows:

## <u>INTRODUCTION</u>

1.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. ("Title VII"), and related state-law claims for sexual harassment and retaliation. Plaintiff seeks declaratory and injunctive relief,

back pay, front pay, compensatory damages, punitive damages, liquidated damages, attorney's fees, and costs.

## JURISDICTION AND VENUE

2.    Plaintiff's Title VII claims present federal questions over which this Court has jurisdiction under 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f)(3).

3.    Plaintiff also invokes the pendant jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under the laws of the State of Georgia, including claims for assault, battery, negligent supervision, and negligent retention.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 (b) and (c) because the events complained of occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and all parties reside within these boundaries.

## PARTIES

5.    Plaintiff is a female citizen of the United States and a resident of the State of Georgia.

6.    Plaintiff is a member of a protected class under Title VII.

7.    Defendant is a foreign limited liability company registered to conduct business in the State of Georgia.

8.    Defendant transacts business in the Northern District of Georgia and is subject to this Court's jurisdiction.

9.    Defendant may be served through its registered agent if service of process is not waived:

Registered Agent Name: **CAPITOL CORPORATE SERVICES, INC.**
Physical Address: **3675 CRESTWOOD PKWY NW STE 350, DULUTH, GA, 30096, USA**
County: **Gwinnett**

## ADMINISTRATIVE PROCEEDINGS

10.    On October 21, 2023, Plaintiff filed a timely charge of sexual harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC").

11.    On March 11, 2024, Plaintiff filed an amended charge of sexual harassment and retaliation with the EEOC.

12.    On September 20, 2024, Plaintiff received a notice of right to sue from the EEOC.

13.    Plaintiff has exhausted all administrative remedies prerequisite to filing this suit under Title VII.

14.    This lawsuit has been filed within 90 days of Plaintiff's receipt of her notice of right to sue.

## STATEMENT OF FACTS

15.    Defendant manages a portfolio of over fifty residential properties across the United States, including in Georgia.

16.    At all relevant times, Defendant employed more than fifteen (15) employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

17.    Defendant is subject to the anti-discrimination and anti-retaliation provisions of Title VII.

18.    Plaintiff was employed by Defendant at all times material to this Complaint.

19.    Plaintiff began her employment with Defendant on or about June 27, 2023, as a Maintenance Technician.

20.    Plaintiff was initially assigned to the River Vista property in Sandy Springs, Georgia.

21.    At River Vista, Plaintiff reported to Maintenance Supervisor Garry Matthews ("Mr. Matthews").

22.    Shortly after her employment began, Mr. Matthews sexually harassed and assaulted Plaintiff.

23.    After verbally harassing her, Mr. Matthew shoved Plaintiff and broke her phone.

24.     When Plaintiff reported the incident, one of the office staff told her to contact the police.

25.     Plaintiff filed a police report.

26.     Plaintiff also emailed Kelly Murphy ("Ms. Murphy") to report the incident.

27.     On or about August 31, 2023, as a result of Plaintiff's complaints, she was offered a transfer position at a nearby property, Lake House ("Lake House") at Martin's Landing, which she accepted.

28.      At Lake House, Plaintiff initially reported to Maintenance Supervisor James Sellar ("Mr. Sellar") and then to Property Manager Araina Howard ("Ms. Howard") after Ms. Howard was hired.

29.     From the beginning of her time at Lake House, Plaintiff was subject to sexually harassing behavior from another employee, "Salaadin."

30.     Salaadin made inappropriate comments to Plaintiff as well as touching her without her consent.

31.     Plaintiff reported Salaadin to Mr. Sellar during her first week at Lake House and asked Mr. Sellar to allow her to complete her own work orders in order to avoid working with Salaadin.

32.    Instead of protecting Plaintiff, Mr. Sellar told Salaadin of her report, and Salaadin cornered Plaintiff in the maintenance shop, cursed at her, and threatened her for reporting him.

33.    Plaintiff was afraid to continue working with Salaadin and felt that Mr. Sellar would not protect her if she complained again.

34.    Plaintiff was also worried that making another report would impact her employment status; however, Salaadin's behavior did not change.

35.    On or about September 14, Plaintiff was forced to commit an unsafe service, namely changing lightbulbs that required the use of a ladder even though she was afraid of heights.

36.    Plaintiff asked Mr. Sellar if someone else could change the lightbulbs, and he replied that no one else was available.

37.    This was particularly unsafe because Salaadin left her on the ladder changing lights while he went outside for a smoke break. which she reported to Mr. Sellar via text message.

38.    Mr. Sellar then witnessed Salaadin grab Plaintiff as she came down the ladder, toss her onto his shoulder, and pat her on the rear end.

39.    Once Ms. Howard was hired in early October 2023, Plaintiff reported the harassment to her since she did not feel safe reporting any further incidents to Mr. Sellar.

40.    Mr. Sellar told the maintenance staff to stay away from Ms. Howard and not report any team-related issues to her, calling her a bitch.

41.    Plaintiff reported this incident, stating that Mr. Sellar was unprofessional and used sexist language.

42.    This language reinforced Plaintiff's feeling that Mr. Sellar was not going to protect his female employees.

43.    On or about October 6, Mr. Sellar had a meeting with Plaintiff and Salaadin after she made another complaint, which again made Plaintiff feel unsafe since she was having to discuss the situation in front of her harasser.

44.    Mr. Sellar took no action after the meeting.

45.    On or about October 11, Plaintiff was assaulted again by Salaadin.

46.    This assault was witnessed by a tenant and another coworker.

47.    Mr. Sellar told Plaintiff that it would be handled and to go back to work.

48.    At that point, due to Mr. Sellar's lack of action on her previous complaints, Plaintiff tried to contact Ms. Howard for assistance.

49.     Shortly thereafter, Ms. Howard returned Plaintiff's call and told her to clock out because Ms. Howard did not think Plaintiff would be safe.

50.     Ms. Howard also sent Plaintiff a text to wait for further instructions.

51.     Further, when Plaintiff reported the latest incident of harassment to Ms. Howard, Ms. Howard stated that Mr. Sellar had not made her aware of the incident.

52.     On or about October 14, Plaintiff was told that Salaadin was to have no further contact with her.

53.     Additionally, Plaintiff was told to report only to Ms. Howard and to avoid the men on staff.

54.     This directive to only report to Ms. Howard was reiterated by "Doug" from Haven.

55.     On or about October 16, Plaintiff called Ms. Howard to clock in at 7:58 A.M. since Plaintiff had never been set up to properly clock in and out at Lake House.

56.     Plaintiff then had a meeting with Ms. Howard and Mr. Sellar at which Ms. Howard told Mr. Sellar to give Plaintiff work orders.

57.     On or about October 18, Plaintiff had a doctor's appointment with a mental health provider.

58.    Plaintiff requested the time off via the employee portal as instructed, and on the morning of the appointment, she reminded Ms. Howard of the appointment.

59.    Ms. Howard told Plaintiff that she would not approve the request even though Plaintiff submitted the request properly and had available PTO, and that Plaintiff would be considered a no show for her shift.

60.    Plaintiff returned to work after the appointment with a doctor's note.

61.    From that point forward, Plaintiff was retaliated against.

62.    Ms. Howard began micromanaging Plaintiff.

63.    Plaintiff was demoted from maintenance technician to groundskeeper labor.

64.    Plaintiff was forced to take early lunches while the rest of the team was able to pick their own lunch time.

65.    Plaintiff was isolated from the rest of the staff and made to feel like she was the problem and that Ms. Howard wanted her to quit.

66.    As a result of her experiences with Defendant, Plaintiff was diagnosed with anxiety and attempted to request FMLA, but she was told that she did not qualify.

67.     On or about November 13, Plaintiff sent a text message to Doug stating that Salaadin continued to try to talk to Plaintiff even after her complaints and the order for him to not contact her.

68.     Plaintiff also stated in the text that she was afraid and that she had to sit in her car that morning because no one else was on property to protect her from Salaadin.

69.     Additionally, Plaintiff stated that Ms. Howard had not spoken to her in over a week since she reported that Salaadin touched her inappropriately.

70.     On or about November 16, Plaintiff made another complaint against Salaadin, reporting that he grabbed her arm and called her his wife.

71.     The next day, Plaintiff was placed on a final warning.

72.     It is worth noting that each time Ms. Howard asked Plaintiff to submit a written report of the incidents, she was not allowed to take a photograph of the reports or keep a copy for herself.

73.     On or about November 22, Plaintiff clocked out for lunch and told Mr. Sellar that her wrist was hurting.

74.     Shortly after leaving, Mr. Sellar and Ms. Howard called Plaintiff and Ms. Howard berated Plaintiff for leaving the property since she was only working a half day.

75.    Plaintiff did not know that working a half day meant she could not leave the property for her required lunch break.

76.    Plaintiff explained that Mr. Sellar told her it was time for her to take lunch but did not tell her she could not leave.

77.    Ms. Howard told Plaintiff she had been sent to lunch to keep her away from others.

78.    After Ms. Howard hung up in anger, Plaintiff asked Mr. Sellar what she should do, and he told her he would call her back.

79.    By that point, Plaintiff decided she needed to see a doctor because of her injured wrist and she would bring back a doctor's note.

80.    Mr. Sellar instantly replied demanding that Plaintiff turn in her copy of the key ID and told Plaintiff that if she did not return to the property by 12:00 P.M., she would be "voluntarily" resigning.

81.    Plaintiff received this message at approximately 11:45 A.M., not giving her enough time to return to the property before Mr. Sellar's noon deadline.

82.    Plaintiff was then terminated.

83.    Plaintiff's termination for job abandonment was pretextual.

84.    In actuality, Plaintiff was terminated for her complaints of sexual harassment and retaliation in violation of Title VII.

## COUNT I

**Sexual Harassment in Violation of Title VII**

85.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

86.    As a female, Plaintiff is a member of a protected group.

87.    As detailed above, throughout her employment with Defendant, Plaintiff was subjected to sexual harassment and a hostile work environment first by Supervisor Garry Matthews and then by coworker Salaadin.

88.    The conduct described above was unwelcome, offensive, and intimidating to Plaintiff, as well as open and obvious in the workplace.

89.    Plaintiff complained that the sexually harassing conduct was unwelcome.

90.    At all times relevant to this action, Defendant knew or should have known of the sexual harassment endured by Plaintiff and the existence of a sexually harassing work environment yet failed to meaningfully remedy the workplace environment to protect Plaintiff.

91.    Defendant willfully and wantonly disregarded Plaintiff's rights. Additionally, Defendant's discrimination and retaliation against Plaintiff were

undertaken in bad faith and constitute unlawful, intentional gender discrimination in violation of Title VII.

92.    As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits (past and future), humiliation, and other indignities. Plaintiff seeks all damages available.

93.    Plaintiff seeks all remedies available by law or equity.

## COUNT II

### Retaliation in Violation of Title VII

94.    Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

95.    Plaintiff engaged in protected activities under Title VII by making complaints of sexual harassment and bullying.

96.    As a result of her complaints of sexual harassment, Plaintiff suffered adverse employment actions, including but not limited to being terminated.

97.    As a direct and proximate result of Defendant's unlawful discriminatory and retaliatory actions, Plaintiff has suffered lost wages and other benefits of employment, significantly diminished employment opportunities, inconvenience, loss of income, and emotional distress, including but not limited to outrage, shock, and humiliation because she exercised her rights under Title VII.

98.    Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's discrimination and retaliation against Plaintiff were undertaken in bad faith.

99.    As a result, Plaintiff is entitled to both equitable and monetary relief in all forms provided by law.

100.   Plaintiff seeks all remedies available to her by law or equity.

<u>**COUNTS III AND IV**</u>

**Negligent Retention and Negligent Supervision**

101.   Plaintiff incorporates by reference the preceding paragraphs as if fully restated herein.

102.   At all times material to this Complaint, Defendant owed a legal duty of care toward its employees to exercise reasonable care and prudence in the hiring, supervision, and retention of its employees.

103.   By and through the conduct, actions, and malfeasance cited above, Defendant breached the above-described legal duties of care that it owed to Plaintiff.

104.   Defendant knew that Mr. Matthews and Salaadin subjected Plaintiff to sexually harassing comments without her consent due to Plaintiff's complaints of sexual harassment and the open and obvious nature of their conduct in the workplace.

105.    Defendant failed to take prompt and appropriate remedial steps to protect Plaintiff and other female employees from sexual harassment.

106.    As a result of Defendant's negligent supervision and retention, Defendant ratified the harasser's behavior.

107.    As a result of Defendant's negligent supervision and retention, Plaintiff suffered damages in the form of lost wages and benefits, significantly diminished employment opportunities, and emotional distress.

**WHEREFORE**, Plaintiff demands a jury trial and the following relief:

(a)    Issue process to Defendant;

(b)    Issue a declaratory judgment that Defendant's acts, policies, practices, and procedures complained of herein violated Plaintiff's rights under Title VII and state law;

(c)    Grant Plaintiff a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys, and those acting in concert with them, from engaging in any employment practice or policy which discriminates against Plaintiff and others similarly situated because of the exercise of their rights under Title VII or because of their participation in this lawsuit;

(d)    Grant Plaintiff judgment in her favor and against Defendant under all counts of this Complaint;

(e)     Order Defendant to make Plaintiff whole by providing her out-of-pocket losses as well as back pay in an amount equal to the sum of any wages, salary, employment benefits, or other compensation denied or lost as a result of Defendant's unlawful and discriminatory acts, together with interest thereon, all in an amount to be proven at trial;

(f)     Grant Plaintiff compensatory and punitive damages for Defendant's willful violations of Title VII;

(g)     Grant Plaintiff reasonable attorney's fees together with any and all other costs associated with this action as provided by Title VII and state law violations;

(h)     Grant Plaintiff all other damages, including nominal damages, available by law; and

(i)     Grant such additional relief as this Court deems proper and just.

Respectfully submitted on this 18th day of December, 2024.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
Attorney for Plaintiff

THE MIXON LAW FIRM
3344 Peachtree Street, Suite 800
Atlanta, Georgia 30326
Phone: 770-955-0100
steve@mixon-law.com